RECEIVED

**IN THE UNITED STATES DISTRICT COURT**

MAR 1 5 2021

**FOR THE DISTRICT OF RHODE ISLAND**

U.S. DISTRICT COURT
DISTRICT OF R.I.

**BRANDON KINARD,**

           **Plaintiff,**

**v.**                                            **CV**

**THE CITY OF PAWTUCKET,**

**PAWTUCKET POLICE DEPARTMENT OFFICERS YOUNG (138),  NOEL**

**PICHARDO, DYLAN SALVATORE (116), TY KARALIS, 130, 141, 135, 35, and JOHN**

**DOE I;**

**THE MIRIAM HOPSITAL,**

**GIANNA PETRONE, DO,**

**FIONA CRAFT, NP,**

**JANE DOE I (TARA),  JANE DOE II (KRISTINE),  and JOHN DOE II (ISAIAH O.);**

**JANE DOE III,  JANE DOE IV,  JANE DOE V**

           **Defendants.**

# COMPLAINT TO RECOVER DAMAGES FOR DEPRIVATION OF CIVIL RIGHTS AND PERSONAL INJURY

## JURISDICTION AND VENUE

Plaintiff brings this complaint under 42 U.S.C. Section 1983, for damages resulting from the Deprivation of Civil Rights and Medical Malpractice inflicted upon Plaintiff by Defendants. The court has jurisdiction of this action (28 U.S.C. Sec. 1343) and of the parties. Venue is proper in this judicial district as the incident complained of occurred in this district. Plaintiff alleges as follows:

## PARTIES

1. Plaintiff Brandon Kinard is an individual who is a resident of Providence, State of Rhode Island

2. Defendant City of Pawtucket is a municipality in the State of Rhode Island.

3. Defendant Young (138) is a law enforcement officer for the Pawtucket Police Department. Defendant was acting under color of state law and in the course and scope of his employment as a law enforcement officer with the Pawtucket Police Department at all times material.

4. Defendant Noel Pichardo is a law enforcement officer for the Pawtucket Police Department. Defendant was acting under color of state law and in the course and scope of his employment as a law enforcement officer with the Pawtucket Police Department at all times material.

5.     Defendant Dylan Salvatore (116) is a law enforcement officer for the Pawtucket Police Department. Defendant was acting under color of state law and in the course and scope of his employment as a law enforcement officer with the Pawtucket Police Department at all times material.

6.     Defendant Ty Karalis is a law enforcement officer for the Pawtucket Police Department. Defendant was acting under color of state law and in the course and scope of his employment as a law enforcement officer with the Pawtucket Police Department at all times material.

7.     Defendant 130 is a law enforcement officer for the Pawtucket Police Department. Defendant was acting under color of state law and in the course and scope of his employment as a law enforcement officer with the Pawtucket Police Department at all times material.

8.     Defendant 141 is a law enforcement officer for the Pawtucket Police Department. Defendant was acting under color of state law and in the course and scope of his employment as a law enforcement officer with the Pawtucket Police Department at all times material.

9.     Defendant 35 is a law enforcement officer for the Pawtucket Police Department. Defendant was acting under color of state law and in the course and scope of her employment as a law enforcement officer with the Pawtucket Police Department at all times material.

10.     Defendant 135 is a law enforcement officer for the Pawtucket Police Department. Defendant was acting under color of state law and in the course and scope of his employment as a law enforcement officer with the Pawtucket Police Department at all times material.

11.     Defendant John Doe I is a law enforcement officer for the Pawtucket Police Department. Defendant was acting under color of state law and in the course and scope of his employment as a law enforcement officer with the Pawtucket Police Department at all times material.

12.     Defendant The Miriam Hospital is a hospital in Providence, Rhode Island. This Defendant, through its agents, acted at the request of law enforcement to aid law enforcement and preformed medical procedures that had no medical purpose.

13.     Defendant Petrone is a physician employed by Defendant The Miriam Hospital or was acting as Defendant The Miriam Hospital's agent at all times material. Defendant was acting under color of state law at the indicated times. This Defendant acted at the request of law enforcement to aid law enforcement and performed medical procedures that had no medical purpose.

14.     Defendant Craft is a nurse employed by Defendant The Miriam Hospital or was acting as Defendant The Miriam Hospital's agent at all times material. Defendant was acting under color of state law at the indicated times. This Defendant acted at the request of law enforcement to aid law   enforcement and performed medical procedures that had no medical purpose.

15.     Defendant Jane Doe I is a CNA employed by Defendant The Miriam Hospital or was acting as Defendant The Miriam Hospital's Agent at all times material. Defendant was acting under color of state law at the indicated times. This Defendant acted at the request of law enforcement to aid law enforcement and performed medical procedures that had no medical purpose.

16.     Defendant Jane Doe II is employed by Defendant The Miriam Hospital or was acting as Defendant The Miriam Hospital's Agent at all times material. Defendant was acting under color of state law at the indicated times. This Defendant acted at the request of law enforcement to aid law enforcement and performed medical procedures that had no medical purpose.

17.     Defendant John Doe II (Isaiah O) is a security guard employed by Defendant The Miriam Hospital or was acting as Defendant The Miriam Hospital's Agent at all times material.

Defendant was acting under color of state law at the indicated times. This Defendant acted at the request of law enforcement to aid law enforcement and performed medical procedures that had no medical purpose.

18.     Defendant Jane Doe III (aged 58) employed by Pawtucket City Hall or was acting as a Pawtucket City Hall agent at all times material. Defendant was acting under color of state law at the indicated times.

19.     Defendant Jane Doe IV (aged 51) employed by Pawtucket City Hall or was acting as a Pawtucket City Hall agent at all times material. Defendant was acting under color of state law at the indicated times.

20.     Defendant Jane Doe V employed by Pawtucket City Hall or was acting as a Pawtucket City Hall agent at all times material. Defendant was acting under color of state law at the indicated times.

## FACTUAL BACKGROUND

### January 18, 2021 Traffic Stop:

21.     On or about January 18, 2021 at approximately 12:55 pm, Plaintiff departed from his then apartment building at 200 Esten Avenue, Pawtucket RI.

22.     After turning left from onto Moshassuck Street from Esten Avenue, Plaintiff noticed two cop vehicles speeding towards Esten Avenue.

23.     Plaintiff turned right onto Main Street (which turns into Pawtucket Avenue) after the light.

24.     While on Pawtucket Avenue, Plaintiff saw two cop vehicles on Main street around 450ft behind him in his rear view mirror, speeding towards his direction with lights and sirens blaring.

25.    Plaintiff attempted to pull over to let the cop vehicles pass him, as he was going to the speed limit, had his seatbelt on, had a license in good standing, and had no reason to believe the cops intended to stop him, especially from so far behind him.

26.    At approximately 1:02 pm after Plaintiff stopped his car, the two cop vehicles swung in front of Plaintiff's vehicle blocking his car, car #55 from the left lane of traffic, and car #105 using the sidewalk to the right side of Plaintiff's vehicle.

27.    Defendant Young (130) and two other officers hastily surrounded Plaintiff's vehicle.

28.    Defendants 130, Young, 141, Dylan Salvatore used excessive force upon approaching Plaintiff's vehicle by attempting to gain access to Plaintiff's vehicle through the door handles, they banged on Plaintiff's vehicle, initially yelling "Get out of the car" then repeatedly yelled at him to roll his window down, threatening to break his window, prior to informing Plaintiff what the traffic stop was for.

29.    After failing to gain access into Plaintiff's vehicle, Defendant Young then seemingly with no reason to have pulled over Plaintiff at all, especially with the amount of cops and force used to attempt to access Plaintiff's vehicle, accused Plaintiff of driving without a seatbelt, even though Plaintiff had his seatbelt on while operating his vehicle.

30.    At this point, Plaintiff knew there was no legitimate reason for the stop. He endured continual harassment, bullying, and intimidation by agents of Pawtucket Police Department.

31.    Plaintiff overheard Defendants 130, 141, and Dylan Salvatore conspire to falsely accuse Plaintiff of taking off during the traffic stop to justify their use of force.

32.    After Defendants 130, 141, Dylan Salvatore finished laughing presumably because they believe they got away with a false stop. Defendant Young returned and tossed paperwork into the tiny slot of Plaintiff's driver's side window.

33. Plaintiff not knowing what the paperwork is for said "I did not accept that" and slid the paperwork back through his window to officer Young, who then attempted to force the paperwork into Plaintiff's window.

34. Plaintiff closed his window, and asked for his license back. Plaintiff then opened the slot his driver's side window.

35. Defendant Young held Plaintiff's license, and said he would not return Plaintiff's license and would mail it to him instead.

36. Plaintiff informed Defendant Young that, in doing so, he would be wrong.

37. Plaintiff asked repeatedly for his license back, to no response.

38. Defendant 130 said "This kid is retarded" and "It's going to be funny when we find a shit ton of weed in his backpack" referring to Plaintiff's black work backpack in Plaintiff's passenger seat containing Plaintiff's external hard drives.

39. Defendant 130's misguided assumption that Plaintiff had weed in his backpack and that the Police would find it made by Defendant 130, conveyed to Plaintiff that the officers were certain that they would find a fault to exploit against Plaintiff that would justify the amount of force and abuse of power they had already displayed during the traffic stop for an alleged no seatbelt ticket, as well as to justify a search of Plaintiff's vehicle.

40. Defendant 130s misguided assumption about Plaintiff being in possession of drugs also lead Plaintiff to believe he was pulled over because he appeared young and he was racially profiled. Based on how the officers pulled Plaintiff over and approached him, Plaintiff knew the officers involved with the traffic stop were not responding as reasonable peace officers should.

41. Defendants Young, 130, 141, Dylan Salvatore, surrounded Plaintiff's car refusing to release his license, and refusing to allow him to leave after the stop. Plaintiff felt he was being

detained because Defendant Young refused to return Plaintiff's license back after the stop, and prevented him from driving away.

42.     Defendant Young said "What do you need us to do to help you".

43.     Plaintiff said "You have my license, you need to give me my license back" since the traffic stop is over.

44.     For approximately 5 minutes Defendant Young refused to give release Plaintiff's license.

45.     Defendant 141 said "He's free to go right" referring to Plaintiff.

46.     Defendant Young said "Oh, yeah that's fine".

47.     Plaintiff said "I need my license".

48.     Defendant Dylan Salvatore said "But now he's obstructing".

49.     Plaintiff said "I'm not obstructing, you have to give me my license, where is my license, where is my license officer".

50.     Plaintiff overheard an officer saying, "This is our realm".

51.     Plaintiff said "This is not your realm, this is God's realm".

52.     Plaintiff overheard an officer say "Just Break his car window".

53.     Defendant Young placed the ticket on Plaintiff's windshield and dropped Plaintiff's license in the window slot.

54.     At Approximately 1:25pm Defendant Young told Plaintiff he is free to go.

## January 18, 2021 Arrest, False Imprisonment, Negligence:

55.     At Approximately 1:26pm immediately following the traffic stop, Plaintiff left his vehicle and entered the parking lot of the Dollar Tree to find a trash bin.

56.     While looking for a trash bin, two officers from the traffic stop ran towards Plaintiff with full force. Defendant John Doe I backed Plaintiff into a corner, grabbed him and both officers placed handcuffs on Plaintiff.

57.     Plaintiff says "I am not resisting".

58.     The Defendant John Doe I placed handcuffs on the defendant and forcibly brought him to one of the cop cars.

59.     More officers arrived on scene.

60.     Plaintiff was not read his Miranda rights.

61.     Plaintiff asked the 4-5 cops surrounding him at the cop car why he was in handcuffs, and what crime did he commit.

62.     Defendant John Doe I asked Plaintiff why he ran.

63.     Plaintiff responded "No. You ran towards me and had guns, I didn't do anything against the law."

64.     Plaintiff was repeatedly asked if he was on any drugs or narcotics. Plaintiff responded no, "I told you all during the traffic stop that I am a man of God."

65.     Plaintiff was placed into an empty cop vehicle in handcuffs.

66.     A search of Plaintiff's vehicle was conducted with all officers on scene surrounding his car. First going through his black work backpack tossing out his external hard drives.

67.     No illegal substances or items were found in Plaintiff's car.

68.     Plaintiff's car was impounded by Dorman's Auto Center, Inc by request of the Pawtucket Police Department.

69.     Two officers transported Plaintiff to The Miriam Hospital against his will.

70.     Once at Miriam, the officers forced Plaintiff out of the vehicle and brought him into The Miriam Hospital.

71.     The officers instructed Plaintiff to have a seat in the hospital.

72.     Plaintiff declined saying he would rather stand.

73.     Plaintiff was forced into a room while in handcuffs and forced to sit down on the stretcher.

74.     Plaintiff told the officer who brought him in the hospital that he was not legally being arrested or detained, as he did not commit a crime. He asked why he is in the hospital, and why was he in handcuffs.

75.     The officer ignored the plaintiff.

76.     Defendant John Doe II entered the hospital room.

77.     Defendant Jane Doe I entered the hospital room and asked Plaintiff to sit back in the stretcher with his feet up, she said he could not sit with his feet down because she would not be able to pass through the hospital freely for the tests she was going to run.

78.     Plaintiff said, I am fine where I am, I will keep my feet close to the stretcher so if you need to move around the room there will be enough space.

79.     Plaintiff said "I was not legally arrested or detained, why am I here."

80.     Defendant Jane Doe I said "You're in the hospital, we need to check your vitals you're going to have to move your legs on the stretcher, if you don't we will have to force your legs onto the stretcher.

81.     Plaintiff said "I do not consent to you running any tests, and if you forcibly try to move me you are violating my rights, because there is no legal reason for me to be here".

82.   Defendant Jane Doe I said "If the officer removes your handcuffs will you be more comfortable to place your whole body on the stretcher".

83.   Plaintiff said "No. There is enough space for you to pass by where I am. Why am I here? I was not arrested or detained according to the officer, so you have me sitting here in handcuffs in this room intimidating me, holding my belongings without my consent against my will, this is illegal, you are kidnapping me."

84.   Defendant Jane Doe I said "You are here because we need to check your vitals."

85.   The officer removed the handcuffs from Plaintiff's arms and left the hospital.

86.   Plaintiff attempted to stand to leave but multiple security guards standing outside the room came in and picked up his legs and forced him to lay in the stretcher.

87.   Once in the stretcher Plaintiff asked Defendant Jane Doe I why he was there. Defendant Jane Doe I said because we have to check your vitals.

88.   Defendant Jane Doe I asked Plaintiff to remove his clothing.

89.   Plaintiff did not consent to removal of his clothing.

90.   Defendant Jane Doe I, Defendant Isiah O, and two other security guards forcibly removed Plaintiff's pants, shoes, socks, and hoodie without Plaintiff's consent.

91.   Defendant Jane Doe I said leave his shorts on.

92.   Defendant Jane Doe I asked Plaintiff for his full name and address.

93.   Plaintiff did not give Defendant Jane Doe I any information about himself.

94.   Defendant Jane Doe I gave Plaintiff hospital socks.

95.   Defendant Jane Doe I and Defendant John Doe II attempted to pull of Plaintiff's ring against his will.

96.     Defendant Jane Doe I told plaintiff that if he tries to move his hand while they attempt to pull of his ring, it would be considered an assault by the Plaintiff in the court of law.

97.     Defendant Jane Doe I and Defendant Isiah O, attempted to remove the ring from Plaintiff's hand.

98.     The ring did not come off Plaintiff's hand.

99.     Defendant Jane Doe II entered the room and forced the ring off Plaintiff's hand, twisting his finger.

100.    Defendant Jane Doe I asked Plaintiff to confirm any information about himself, his name, address.

101.    Plaintiff asked "Why?".

102.    Defendant Jane Doe I said "Because we need to know you're the right person."

103.    Plaintiff said  "If this situation was legal, which it isn't, then the officer who had me in handcuffs should have given you paperwork with all my information on it during the transfer of custody, you saw the officer bring me into the hospital so you know I am the same person they brought in. I am not giving you any information; you should already have it."

104.    Defendant Jane Doe I checked Plaintiff's blood pressure against his will.

105.    One guard was placed in Plaintiff's room.

106.    Plaintiff was moved to another hospital room, as the guard followed.

107.    Another Nurse came in and asked Plaintiff for his name and address etc.

108.    Plaintiff asked the nurse why he was in the hospital.

109.    The nurse said she did not know but if Plaintiff did not give her his name and information then she would leave and would not come back to the room until hours later.

110. Plaintiff does not accept the ultimatum and tells the nurse that he was not legally arrested or detained so there is no reason for him to be there and that he would like to leave.

111. The nurse exited the hospital room.

112. Defendant Petrone entered the hospital room and said Hi to Plaintiff.

113. Plaintiff's asked Defendant Petrone why he was in the hospital.

114. Defendant Petrone said to check to see if Plaintiff was ok.

115. Plaintiff said I am here against my will, I was not legally arrested or detained I would like my stuff and I would like to go.

116. Defendant Petrone told Plaintiff that he could not leave until after the tests were completed and he has been discharged.

117. Defendant Petrone exited the room.

118. Defendant Petrone reentered the room.

119. Plaintiff repeated that he is in the hospital against his will, he was not legally arrested or detained and he was never legally in police's custody for them to turn him into hospital's custody.

120. Plaintiff said he did not consent to any tests, or the removal of his clothes and jewelry, and was being held against his will.

121. Plaintiff asked Defendant Petrone why he is still in the hospital.

122. Defendant Petrone said that they wanted to check if he is ok, and that plaintiff may not leave the hospital until she cleared him.

123. Defendant Petrone then left the room but remained in the area.

124. Plaintiff got up out of hospital stretcher and stepped forward toward the curtain separating the area he was in from the hallway.

125.   A Security guard stepped in front of Plaintiff stopping him from moving forward.

126.   Plaintiff explained to security guard that he was not in the hospital's custody by a legal police order and asked for the security guard to give him his belongings so that he may go home, if not he will leave.

127.   Between 6 and 10 security guards were called and arrived to in front of Plaintiff's hospital room. One of them stepped forward and Plaintiff respectfully explained that he was not legally arrested or detained and with his free will he would like his belongings released to him so that he may leave.

128.   The security officer said he understands but Plaintiff could not leave the hospital until the doctor has finished running her tests.

129.   Plaintiff again explained to the security guard that he was not arrested nor detained, was not in police custody legally and was not in the custody of the hospital so having free will he we like to receive his belongings and leave.

130.   Plaintiff informed the security guard that if they do not allow him to leave they are illegally holding him against his will, "kidnapping" him.

131.   Plaintiff said "fine, since you don't want to give me my belongings, I'm going to leave them here."

132.   At this point Plaintiff is aware that the security guards knew or should have known that legally he should be allowed to leave with his belongings, but that they are holding him illegally.

133.   Plaintiff's used his right to free speech and says "I am here to tell you that Jesus Christ is coming back".

134.   Plaintiff stepped forward again to leave the hospital.

135.   The security guards charged at Plaintiff and assaulted him.

136.    Defendant Petrone told the nurses to get syringes and called out the names of specific medications to administer.

137.    The guards pinned Plaintiff down as he began to resist due to their excessive force, they strapped his arms in and he was unable to move, his leg was bent into the side of the stretcher and contorted in such a way that led to sprains.

138.    Plaintiff yelled I am not resisting anymore you do not have to apply so much pressure as more than five security guards pinned him down.

139.    The guards strapped his legs into brown straps.

140.    Two nurses including Defendant Craft administered two shots to Plaintiff's left leg and one shot to Plaintiff's right leg.

141.    Defendant Jane Doe I entered the room to Plaintiff's left side.

142.    Plaintiff begun to start feeling the effects of the medication.

143.    Defendant Jane Doe I said "Do you remember me" in a sarcastic tone.

144.    While under medication Plaintiff again explained to Defendant Petrone, that he was not legally in the custody of the hospital.

145.    Defendant Petrone begun to ask Plaintiff questions.

146.    Defendant Petrone asked why is he here?

147.    While under medication Plaintiff said "I am here because the police brought me in without a reason and left me here, they said I was not arrested or detained, yet they brought me in handcuffs illegally, I would like my belongings and I would like to leave.".

148.    Defendant Petrone then said "Ok. The Police brought you here for a psychiatric evaluation.".

149.    Plaintiff presumed Defendant Petrone created the story then and there to justify the Police's misconduct in bringing him there without a lawful order because before Plaintiff revealed why he was there to her, Defendant Petrone did not know the reason for Plaintiff being in the hospital.

150.    One of the security guards tasked to stand by Plaintiff's curtain said, "I would've just said I was drunk."

151.    A female guard was put on watch in Plaintiff's room.

152.    Defendant Craft came in for an ECG test and struggled for around 10 minutes to get a reading.

153.    Plaintiff asked to be released as he could not move his arms or legs in the restraints.

154.    Defendant Craft said they would remove the restraints after the blood tests.

155.    Defendant Craft left the room.

156.    Defendant Craft returned with 7-10 vials for blood tests.

157.    Plaintiff said I do not consent to any of these test, and why are there so many vials.

158.    Defendant Craft took the blood anyway, disregarding Plaintiff's non-consent and explained that each vial was for a different test and explained how much blood was being taken in each vial and how much blood was being taken altogether.

159.    The drugs given to Plaintiff made him tired.

160.    Plaintiff was asked to give contact information of someone he knew.

161.    At or around 8:52 pm Plaintiff was given his phone to text his family telling them where he was.

162.    At or around 10:27 pm Plaintiff was forced to pee in a cup.

163.    Some restraints were removed from Plaintiff.

164.    At or around 12:00 am Plaintiff was told to exit the hospital room given his belongings and told to follow a security guard to the front desk.

165.    Plaintiff was discharged at 12:03 am.

166.    Plaintiff was told to vacate the hospital by security guard.

## Feb 16, 2021 False Arrest, Police Misconduct

167.    On or about February 16, 2021 at approximately 3:10 pm, Plaintiff arrived at the Pawtucket Police Department Records office to pick up records made available to the public for the arrest/detainment/transportation to Miriam that occurred January 18, public names of officers based on their badge ID numbers, as well as to ask about public records of an incident between Plaintiff and Pawtucket Police from November 15, 2020 where Plaintiff was harassed in the parking lot of his apartment building by Pawtucket Police. Plaintiff remained in calm and respectful demeanor during the duration of his dealings with the agents of City Hall and the Pawtucket Police Department.

168.    Plaintiff approached the information desk and was asked by Defendant Jane Doe V his reason for coming in.

169.    Defendant Jane Doe V responded he was there for an arrest record/report.

170.    Defendant Jane Doe V lead Plaintiff to the door for the records department.

171.    Plaintiff was the only one in line at the records window.

172.    Defendant Jane Doe III approached the window and told Plaintiff to wait a few moments.

173.    Plaintiff patiently waited.

174.    Defendant Jane Doe III approached the window and asked how she can help.

175.    Plaintiff asked Jane Doe III about the records for the arrest/detainment that occurred on February 16, 2021.

176.    Defendant Jane Doe III asked Plaintiff his name.

177.    Plaintiff gave Defendant Jane Doe III his name.

178.    Defendant Jane Doe III informed Plaintiff that there was no record of an arrest/detainment on February 16, 2021.

179.    Confused as to why there would be no records of the incident, Plaintiff asked Defendant Jane Doe III why his car was towed by Pawtucket Police and why he was brought to The Miriam Hospital in handcuffs if no arrest/detainment occurred.

180.    Defendant Jane Doe III said because of a rescue.

181.    Plaintiff says Ok.

182.    Plaintiff then asked Defendant Jane Doe III for the names of four officers 130, 138, 141.

183.    Defendant Jane Doe III said that she could not provide Plaintiff with the officer's names however Defendant Jane Doe V outside of the records office would be able to provide him with the names of officers.

184.    Defendant Jane Doe IV took over the computer that Defendant Jane Doe III was using but did not interact with Plaintiff. Defendant Jane Doe IV left and Defendant Jane Doe III returned to her seat.

185.    Defendant Jane Doe III said she can print the traffic ticket from the stop that occurred before Plaintiff's car was towed and he was brought to Miriam, as well as provide him with the name of the officer who wrote the traffic report.

186.    Plaintiff said ok and exited the records room to speak with Defendant Jane Doe V.

187.   Plaintiff informed Defendant Jane Doe V that he was told by Defendant Jane Doe III that Defendant Jane Doe V would be able to provide Plaintiff with specific officers names based on their ID badge numbers.

188.   Defendant Jane Doe V informed Plaintiff that she was unable to provide Plaintiff with the information about the officers, she said that the woman in the records office (Defendant Jane Doe III) made a mistake and that she ((Defendant Jane Doe III) should be able to provide me with that information.

189.   Defendant Jane Doe V asked Plaintiff if he would like to go back into the office.

190.   Plaintiff said "Ok" because he was there to retrieve information about the officers as well as to ask if there is a public record on the incident from November.

191.   Plaintiff was then lead back to the records line, being the only one in line.

192.   Upon Plaintiff speaking with Defendant Jane Doe III for the second time,  Plaintiff relayed to her what he was told by Defendant Jane Doe V.

193.   Defendant Jane Doe IV whom has no business with Plaintiff, got up to approach him where he was on the other side of the glass separating the office from the records line.

194.   Defendant Jane Doe IV harassed Plaintiff, accused him of false claims, stating a false reason of why Plaintiff was there or what business he had.

195.   The Defendant Jane Doe IV called the police on Plaintiff, who was not finished conducting his business with Defendant Jane Doe III, but has paused to address Defendant Jane Doe IV who he felt was treating him unreasonably. Plaintiff remained where he was to speak to the police once they arrived as he has done nothing wrong. Plaintiff felt was not given the opportunity to continue conducting his business as he still had requests for public documentation.

196.   Defendant Pichardo arrived and invaded Plaintiff's personal space by giving him orders, and waving his hand in Plaintiff's face.

197.   Defendant Pichardo asked if Plaintiff would like to go outside to talk.

198.   Plaintiff continually neglected and said he would rather speak where he was standing as he was still conducting business with city hall, all within his rights, and had done nothing wrong.

199.   Defendant Jane Doe IV repeated that others have to conduct business while attempting to stop plaintiff from conducting his for no reason. She attempted to tell Plaintiff that his business was done (instead of asking if his business was done), without knowing if it was, also without giving Plaintiff an opportunity to address his further reasons for being there.

200.   Plaintiff did not believe there was any reasonable reason for her to approach him the way she did and escalate the situation to the cops, Plaintiff was patient and respectful.

201.   A man in the hallway with whom Jane Doe IV is speaking said "don't arrest him",

202.   Jane Doe IV herself said "I don't want him arrested."

203.   Plaintiff exercised his right to be in a public space for a lawful reason doing nothing wrong.

204.   Three additional officers arrived and continued to invade Plaintiff's personal space.

205.   Defendant Pichardo threatened Plaintiff with trespassing although Plaintiff was in a public building, was not causing a disturbance and was conducting business.

206.   Defendant Dylan Salvatore attempted to verbally intimidate Plaintiff into telling Defendant Jane Doe III his business.

207.   Defendant Dylan Salvatore said to Defendant Jane Doe III "Do you want to just take his question here, so we can get him out of here, he has one question".

208.    Plaintiff responded  "So we can get him out of here? What is this for, What do you mean? " As he had done nothing to result in four cops to be intimidating him while he is in line at city hall for public records.

209.    Plaintiff asked why there were four Pawtucket Police there attempting to intimidate him.

210.    Plaintiff was repeatedly yelled at to ask Defendant Jane Doe III his question.

211.    Plaintiff did not understand why he was being surrounded by cops yelling at him to conduct his business, he was not doing anything wrong and did not want to tell the Defendant Jane Doe III what he was there for (reports on the November incident with Pawtucket Police), seeing that it may include officers who were standing in front of him.

212.    Defendant Dylan Salvatore attempted to intimidate Plaintiff by entering his personal space grabbing his shoulder, and then ordering "Put your mask on", multiple times while Plaintiff had his mask on.

213.    Plaintiff is handcuffed for no reason by Defendant Ty Karalis.

214.    While in handcuffs, Plaintiff is pulled and dragged off the floor preventing him from walking himself outside by Defendant Dylan Salvatore.

215.    While being dragged Plaintiff told Defendant Dylan Salvatore that he could not walk straight while they were pulling and pushing him dragging him off the ground, Plaintiff asserted he was not resisting the false detainment.

216.    While being dragged outside during said false detainment. Defendant Dylan Salvatore said "If you pull on me one more time, you're going to jail for obstructing and resisting, so pull on me one more time".

217.    Once outside Defendant Pichardo punched Plaintiff near the neck, while unable to defend himself in handcuffs.

218.   Defendant Dylan Salvatore called Plaintiff a racial slur ("Nigga").

219.   Plaintiff was being pulled by Defendant Dylan Salvatore who is on Plaintiff's left, with his right arm on Plaintiff's back and his left arm/hand free.

220.   Defendant Dylan Salvatore then said ""Whoops don't fall Nigga" placed his left arm on the left shoulder of Plaintiff, bended his knees and intentionally threw Plaintiff's body against the cement leaving Plaintiff with injuries.

221.   Plaintiff was shaken up from being punched in the face, and thrown on the sidewalk.

222.   Plaintiff said "You saw that man, you saw that man" referring to Defendant Pichardo punching him in the neck and Defendant Dylan Salvatore throwing him on the cement for no reason.

223.   Defendant Dylan Salvatore began searching Plaintiff saying "doing our fucking jobs getting fucked up by you".

224.   Defendant Ty Karalis said I'm not saying that no one didn't (hit you)…but When we show up, and we try to be gentle with you, and we have this officer over here trying to ask you nice and kind and we ask you to go outside and be gentlemen, You Do it!, I don't know what point you're trying to prove, were trying to help you out. You got three of the nicest guys trying to help you, literally".

225.   Defendant Dylan Salvatore finished searching Plaintiff and finds nothing.

226.   Defendant Dylan Salvatore said some people don't want help, he doesn't want help, while Plaintiff exercised his right to remain silent".

227.   Defendant Dylan Salvatore said he wants a jail cell.

228.   Plaintiff said, I don't want a jail cell.

229.   Defendant Dylan Salvatore said "You got a jail cell you got it, no problem, you're welcome, anytime, get in".

230.   Defendant Dylan Salvatore said "We had a COVID prisoner back there, we had a COVID prisoner back there".

231.   Plaintiff asked "What is the reason for this (the arrest), and they shove close the police door".

232.   Defendant Ty Karalis said "what's that you have a sharp object in your hand".

233.   Defendant Ty Karalis took the object (car key) and Plaintiff's ID, also in Plaintiff's hand.

234.   Plaintiff asked for ID back.

235.   Defendant Ty Karalis said "No" and closed the door.

236.   Defendant Ty Karalis said "Obstruction, I got disorderly, we're gonna do obstruction, I don't know if we can do a trespass it's a public place, that's like trespassing for the Library, I tried to do that once, and they were like..".

237.   Defendant Dylan Salvatore said "Just what I wasn't to be fucking doing right now, instead of going home, deal with you".

238.   Plaintiff said "You know you pulled me out right".

239.   Defendant Dylan Salvatore said "Shut up".

240.   Plaintiff said "and you threw me on the floor, and you said its slippery, but you threw me on the floor, that was you, you did that, you know that right, I didn't cause any disturbance you know that".

241.   Plaintiff believed the officers involved with his arrest and booking assumed Plaintiff had a prior criminal background because they informed him he would be in a cell until the next day.

242.    While in police custody, Plaintiff endured laughs and jokes by Pawtucket Police Department Officers as well as yelling fits of Defendant Pichardo who gloated at the fact that Plaintiff's record would now be tarnished.

243.    Plaintiff was booked and fingerprinted.

244.    Around 4pm, Plaintiff's family contacted the Pawtucket Police Department and was told Plaintiff would be released at 8pm. At the same time the booking officers informed Plaintiff that he would be in the cell overnight. This lead Plaintiff to believe that Defendant officers had already checked and discovered Plaintiff had no prior criminal background upon booking, so they could not hold him overnight, however they purposefully left Plaintiff in the cell for hours, telling him that he wouldn't be released without seeing a judge the next day, purposefully keeping him, a man with no criminal background, in a state of psychological turmoil.

245.    Around 8pm while in his cell, Plaintiff was approached by an officer who threatened Plaintiff saying if he did not sign the following paperwork, he would not be released that night. At a glance it was the paperwork that he had legally refused to sign prior to being fingerprinted by Defendant Dylan Salvatore.

246.    Deciding not to argue over the threat to keep him overnight, Plaintiff signed the paper, was given his belongings, and was escorted the exit of the Police Department.

247.    At the exit, Plaintiff put on his coat, and placed the paperwork which he was threatened with in a garbage bin next to him, as a sign to let the officer know, that Plaintiff knew that The Pawtucket Police Department had been playing games with him.

248.    Plaintiff took a few steps out the building and took out his phone to call his parents for a ride.

249.    Less than five minutes later Defendants 35, and 135 exited the building, Defendant 135 moving hastily and erratically as though he was going to draw a weapon on Plaintiff. Plaintiff is threated again this time by Defendant 135 who told Plaintiff that if he doesn't move from where he is, that he will be thrown back in a cell.

250.    To avoid further unreasonable interactions with officers, Plaintiff vacated the vicinity while on the phone with his ride home.

## COUNT I – UNREASONABLE SEARCH AND SEIZURE (IMMEDIATELY AFTER TRAFFIC STOP, JANUARY 18,  2021) (Against Pawtucket Police Department, Defendant John Doe I)

Plaintiff incorporates the preceding paragraphs by reference herin.

251.    Defendant John Doe I lacked probable cause to detain Plaintiff after the traffic stop.

252.    Defendant John Doe I lacked probable cause to seize and search Plaintiff's vehicle.

253.    Defendant John Doe I's acts were objectively unreasonably.

254.    Defendant John Doe I's acts violated Plaintiff's Fourth Amendment rights to be secure in his person from unreasonable search and seizures.

255.    Defendant John Doe I's deprivation of Plaintiff's rights caused Plaintiff damages.

256.    Defendant officers acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive the Plaintiff of his Constitutional Rights. As a result of the nature of Defendants' conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

## COUNT II – FIRST AMENDMENT RETALIATION (JANUARY 18, 2021)

## (Against Defendant City of Pawtucket and Defendant John Doe I)

Plaintiff incorporates the preceding paragraphs by reference herin.

257.    Plaintiff believes, and therefore avers, that Plaintiff's religious statements in response to

Defendant John Doe I's questions caused Defendant John Doe I (officer who placed Plaintiff in

handcuffs) of Pawtucket Police to retaliate against Plaintiff by further detaining Plaintiff, seizing

his vehicle, and transporting him to The Miriam Hospital.

258.    Plaintiff's religious statements asserting that as a man of God he does not drink alcohol

or take drugs were protected first amendment activity.

259.    Defendant John Doe I retaliation was unlawful and would chill an ordinary person in the

exercise of first amendment rights, namely verbally asserting their rights, religion, and innocence

to peace officers.

260.    As a result of Defendant John Doe I officers conduct, Plaintiff suffered damages.

261.    Defendant John Doe I acted willfully, knowingly and purposefully and/or with deliberate

indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of

Defendant's conduct, Plaintiff is entitled to recover punitive damages against the individual

Defendant.

## COUNT III - UNREASONABLE SEARCH AND SEIZURE (JANUARY 18, 2021,

## ARREST) (Against Defendant City of Pawtucket and the Corresponding Police Officers)

Plaintiff incorporates the preceding paragraphs by reference herin.

262.    Defendant officers detained Plaintiff for such an unreasonable amount of time that Defendant officers constructively placed plaintiff under arrest.

263.    During this arrest, Plaintiff was handcuffed, and driven to The Miriam Hospital in Providence, Rhode Island.

264.    Defendant officers lacked probable cause to arrest Plaintiff.

265.    Defendant officers did not obtain a warrant to arrest Plaintiff.

266.    Defendant officers deprived Plaintiff of his Fourth Amendment rights to be secure in his person by arresting him.

267.    The arrest was wrongful, without probable cause and deprived Plaintiff of his Fourth Amendment right to be free of unreasonable seizures.

268.    The actions of Defendant officers proximately caused damages to Plaintiff in loss of liberty, embarrassment, humiliation, pain and suffering, and mental and emotional distress.

269.    Defendant Officers acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendants' conduct, Plaintiff is entitled to recover punitive damages against the individual Defendant.

270.    The actions of the Defendant officers were the result of wither a lack of training and supervision or a de facto policy of failing to comply with Fourth Amendment Standards on the part of Pawtucket.

## COUNT IV – UNREASONABLE SEARCH AND SEIZURE (BLOOD TESTS - JANUARY 18, 2021)

### (Against Defendant Petrone, Defendant Craft, The Miriam Hospital)

Plaintiff incorporates the preceding paragraphs by reference herein.

271.    Defendant Petrone, Defendant Craft were acting under the color of state law when they wrongfully and without probable cause, took Plaintiff's Blood.

272.    Defendant Petrone and Defendant Craft did not reasonably rely on the validity of arrest/detainment to justify the search.

273.    Defendant Petrone and Defendant Craft acts were objectively unreasonable.

274.    Defendant Petrone and Defendant Craft acts violated Plaintiff's Fourth Amendment rights to be secure in his person from unreasonable search and seizures.

275.    Defendant Petrone and Defendant Craft, deprivation of Plaintiff's rights caused Plaintiff damages.

276.    Defendant Petrone and Defendant Craft, acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendants' conduct, Plaintiff is entitled to recover punitive damages against the individual Defendants.

## COUNT V – UNREASONABLE SEARCH AND SEIZURE (URINE TESTS - JANUARY 18, 2021)

### (Against Defendant Petrone, Defendant Craft, and The Miriam Hospital)

Plaintiff incorporates the preceding paragraphs by reference herein.

277.    Defendant Petrone and Defendant Craft were acting under the color of state law when they wrongfully and without probable cause, took Plaintiff's urine.

278.    Defendant Petrone and Defendant Craft did not reasonably rely on the validity of arrest/detainment or detainment to justify the search.

279.    Defendant Petrone and Defendant Craft acts were objectively unreasonable.

280.    Defendant Petrone and Defendant Craft acts violated Plaintiff's Fourth Amendment rights to be secure in his person from unreasonable search and seizures.

281.    Defendant Petrone and Defendant Craft's deprivation of Plaintiff's rights caused Plaintiff damages.

282.    Defendant Petrone and Defendant Craft, acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendants' conduct, Plaintiff is entitled to recover punitive damages against the individual Defendants.

## COUNT VI – MUNICIPAL LIABILITY AND VIOLATION OF DUE PROCESS
### (JANUARY 18, 2021)
### (Against ALL Defendants)

Plaintiff incorporates the preceding paragraphs by reference herein.

283.    In practice, the City of Pawtucket and the Pawtucket Police Department have used its peace officers to bully, harass, and deprive citizens of their civil liberties.

284.    The peace officers have worked within their agency to promote this environment.

285.    The municipal Defendants used their peace officers to interfere with Plaintiff's property interest and his liberty interests.

286.    Defendants' conduct either in their individual acts or contribution to this abusive environment caused Plaintiff's freedom to be violated, searching his person, his vehicle, his blood, and urine all which were found to be clean, leaving Plaintiff with a plethora of damages, and bills.

287.    The Defendants have ignored procedural and substantive Due Process requirements in an unlawful campaign to harass, punish, and bully private citizens, namely of color, who they suspect for minor criminal activities despite a laughable absence of probable cause and evidence.

288.    The municipal Defendants have trained their officers and have implemented a policy of conducting traffic stops without lawful reason, and turning them into invasive searches and seizures, flouting constitutional requirements related to private property and liberty interests.

289.    The municipal Defendants have trained their officers and have implemented a policy of harassing, intimidating and accusing private citizens of color with whatever they believe can legally hold up in court, justifiable or not, crafting narratives to relinquish their own liability (effectively blotting out their systematic police misconduct) rather than maintaining peace.

290.    Defendants actions intentionally and willfully deprived Plaintiff of his property interests and Plaintiff's liberty interests without due process of law and without recourse for the arbitrary, abusive, harassing, and criminal conduct of Defendants.

291.    Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendants' conduct, Plaintiff is entitled to recover punitive damages against the individual Defendants.

### COUNT VII – NEGLIGENCE (JANUARY 18, 2021)

### (Against Defendants The Miriam Hospital, Petrone, Craft, Jane Doe I, and Jane Doe II)

Plaintiff incorporates the preceding paragraphs by reference herein.

292.    Defendants The Miriam Hospital, Petrone, and Craft, Jane Doe I owed Plaintiff a duty of care conforming to professional standards.

293.    Defendants The Miriam Hospital, Petrone, and Craft, Jane Doe I breached that duty of care and failed to conform to the professional standards by preforming unnecessary medical treatments against Plaintiff's will which were neither medically necessary for Plaintiff including:

    a.  vital signs;

    b.  ecg 12 lead imaging tests;

    c.  administration of Benadryl

    d.  administration of Haldol

    e.  administration of Ativan

    f.  administration of sodium chloride 0.9% bolus (NS)

    g.  urinalysis

    h.  extraction of Plaintiff's Blood

294.    As a result of Defendant The Miriam Hospital, Petrone, and Craft, Jane Doe I breach of duty, Plaintiff suffered damages, including but not limited to: emotional distress, pain and suffering and the medical bills Defendant physicians continually demand from Plaintiff.

295.    Defendant Petrone, and Craft, Jane Doe I, Jane Doe II conduct was malicious and/or in reckless disregard of Plaintiff, and Plaintiff is entitled to compensatory and punitive damages.

## **COUNT VIII – BATTERY (JANUARY 18, 2021)**

### **(Against Defendants Petrone, Kraft, Jane Doe I, Jane Doe II, John Doe II and The Miriam Hospital)**

Plaintiff incorporates the preceding paragraphs by reference herein.

296.    Defendants caused offensive contract with Plaintiff's person in each of the following acts:

    a.  checking vital signs;

    b.  ecg 12 lead imaging test;

    c.  administration of haldol

    d.  administration of ativan

    e.  administration of benadryl

    f.  administration of sodium chloride 0.9% bolus (NS)

    g.  urinalysis

    h.  forcing Plaintiff legs into stretcher upon arrival

    i.  forcing clothes off Plaintiff

    j.  forcing Plaintiff's ring of his finger

    k.  restraining Plaintiff's arms and legs to stretcher

    l.  extraction of Plaintiff's blood and blood tests

297.    Defendants' conduct constituted twelve separate and distinct counts of battery on Plaintiff.

298.    Defendants acted together in a concerted effort to cause the batteries.

299.    As a result of the twelve batteries, Plaintiff suffered damages.

### COUNT IX - FALSE IMPRISONMENT (JANUARY 18, 2021)

### (Against Defendants The Miriam Hospital, Petrone, Craft, John Doe II, Jane Doe I, and Jane Doe II)

Plaintiff incorporates the preceding paragraphs by reference herein.

300.    Defendants intentionally confined Plaintiff in the hospital room without consent.

301.    Defendants knew, or should have known, that they had no lawful authority to detain Plaintiff there was no lawful arrest or detainment by Pawtucket Police Department Officers.

302.    After Plaintiff informed Defendants that they were unlawfully holding him and his belongings against his will, Defendant Petrone unnecessarily and negligently ordered security to further detain Plaintiff physically restraining his arms and legs, ordering medical staff to administer unnecessary medication.

303.    While restrained Defendant Petrone ordered a series of tests to be run on Plaintiff, while he continually denied giving his consent.

304.    Defendants unlawfully confined Plaintiff from around 1:45 PM on January 18, 2021 until he was discharged from the hospital at or around 12:03 AM on January 19, 2021.

305.    Defendants' conduct constituted false imprisonment of Plaintiff, as he repeatedly informed the staff that he would like his belongings and would like to leave (documented) as he was not lawfully arrested / nor detained by agents of the Pawtucket Police Department.

306.    As a result of the false imprisonment, Plaintiff suffered damages.

## COUNT X - UNREASONABLE SEARCH AND SEIZURE (FEBRUARY 16, 2021, ARREST)

### (Against Defendant City of Pawtucket and the Corresponding Police Officers)

Plaintiff incorporates the preceding paragraphs by reference herein.

307.    Defendant officers lacked probable cause to arrest Plaintiff.

308.    Defendant officers did not obtain a warrant to arrest Plaintiff.

309.    While in handcuffs, Plaintiff asked Defendant Dylan Salvatore the reason for Plaintiff being in handcuffs. Defendant Dylan Salvatore did not respond with a reason, however said we already told you.

310.    While being dragged to the entrance of City Hall Defendant Dylan Salvatore threatened Plaintiff with an arrest saying, "if you pull on me one more time, you're going to jail for obstructing and resisting, so pull on me one more time" proving that Plaintiff was being dragged out of City Hall in handcuffs by Defendant officers, without having committed a crime or being suspected of a crime.

311.    Defendant officers deprived Plaintiff of his Fourth Amendment rights to be secure in his person by arresting him.

312.    Plaintiff was not read his rights.

313.    The arrest was wrongful, without probable cause and deprived Plaintiff of his Fourth Amendment right to be free of unreasonable search and seizures.

314.    The actions of Defendant officers proximately caused damages to Plaintiff in loss of liberty, embarrassment, humiliation, pain and suffering, and mental and emotional distress.

315.    Defendant officers acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendants' conduct, Plaintiff is entitled to recover punitive damages against the individual Defendants.

316.    The actions of the Defendant officers were the result of wither a lack of training and supervision or a de facto policy of failing to comply with Fourth Amendment Standards on the part of Pawtucket.

## COUNT XI – FIRST AMENDMENT RETALIATION (FEBRUARY 16, 2021)

### (Against Defendant City of Pawtucket and the Corresponding Police Officers)

Plaintiff incorporates the preceding paragraphs by reference herin.

317.    Plaintiff believes, and therefore avers, that Plaintiff's statements in response to Defendant officers request to "talk outside, instead of in front of everyone" caused Defendant officers Pawtucket Police to retaliate against Plaintiff by detaining, physically attacking, and arresting Plaintiff.

318.    Plaintiff's statements asserting that he was fine with speaking where they were in front of others, instead of going outside, were protected first amendment activity.

319.    Defendant officers' retaliation was unlawful and would chill an ordinary person in the exercise of first amendment rights, namely verbally asserting their rights to peace officers.

320.    As a result of Defendant officers conduct, Plaintiff suffered damages.

321.    Defendant officers acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant officers' conduct, Plaintiff is entitled to recover punitive damages against the individual Defendants.

## COUNT XII – EXCESSIVE FORCE (FEBRUARY 16, 2021)

### (Against Defendant City of Pawtucket and the Corresponding Police Officers)

Plaintiff incorporates the preceding paragraphs by reference herein.

322.    Defendants attempted to intimidate Plaintiff into providing information with use of four officers. As Plaintiff was inline at City Hall, they attempted to force him to conduct his business with Defendant Jane Doe III in front of them.

323.    After Plaintiff lawfully declined Defendants Pichardo's requests to talk outside. Defendant Ty Karalis, Pichardo threatened Plaintiff with criminal trespassing in a public building.

324.    Defendant officers interfered with Plaintiff's property interest and his liberty interests. Defendant Dylan Salvatore threatened Plaintiff while dragging him in handcuffs saying "If you pull on me one more time, you're going to jail for obstructing and resisting, so pull on me one more time" exhibiting that before there was a reason to be arrested, Plaintiff was being dragged out of City Hall without having committed a crime or being suspected of a crime.

325.    Defendant officer punched Plaintiff in the face, while unable to protect himself in handcuffs.

326.    Defendant Dylan Salvatore called Plaintiff a racial slur "Nigga" before throwing him on the cement.

327.    Defendant Dylan Salvatore intentionally threw "Plaintiff's body against the cement while dragging him outside the building" leaving Plaintiff with injuries.

328.    Defendant officers used an unreasonable amount of force during their dealings with Plaintiff both physically, and verbally leaving Plaintiff with injuries.

## COUNT XIII – EXCESSIVE FORCE (TRAFFIC STOP, JANUARY 18, 2021)

### (Against Defendant City of Pawtucket and the Corresponding Police Officers)

Plaintiff incorporates the preceding paragraphs by reference herein.

329.    Defendant utilized multiple cop vehicles in total to block Plaintiff's lane of travel as well as pull him over after he had already stopped for the traffic stop, before calling more vehicles to the scene.

330.    Before informing Plaintiff why he was stopped Defendant officers attempted to intimidate, bully, and harass Plaintiff by hastily surrounded Plaintiff's car and attempting to access Plaintiff's vehicle pulling his door handles, ordering him to get out of the car and open the windows with threatens to break them for no justifiable reason.

331.    The traffic stop resulted in a mere allegation of driving without a seatbelt, which does not justify the amount of force Defendant officers used.

332.    Defendant officers' approach and acts were objectively unreasonable.

333.    The actions of Defendant officers caused damages to Plaintiff in mental and emotional distress.

## COUNT XIV - FALSE IMPRISONMENT (TRAFFIC STOP, JANUARY 18, 2021)

### (Against Defendant City of Pawtucket and the Corresponding Police Officers)

Plaintiff incorporates the preceding paragraphs by reference herein.

334.    Defendant officers intentionally confined Plaintiff in his car after the traffic stop, threatening to mail his license back to him instead of returning it to him then and there, and threatening to accuse Plaintiff of trying to take off on them, if he moved his vehicle.

335.    Defendants knew, or should have known, that they had no lawful authority to detain Plaintiff following the traffic stop.

336.    After Plaintiff informed Defendant officers that they were unlawfully holding his license after the stop, Defendant officers intentionally ignored Plaintiff's requests for his license leaving

Plaintiff to sit in his car for minutes under the premise that if he moved his car they would reengage with allegations of Plaintiff trying to drive off on them.

337.    Defendant officers unlawfully confined Plaintiff after the traffic stop from around 1:18 PM on January 18, 2021 until he was given his license back at or around 1:25 PM on January 18, 2021.

338.    Defendants' conduct constituted false imprisonment of Plaintiff.

339.    As a result of the false imprisonment, Plaintiff suffered damages.

## JURY DEMAND

340.    Plaintiff hereby demands trial by jury.

## REQUEST FOR RELIEF

Plaintiff incorporates the preceding paragraphs by reference herein.

WHEREFORE, Plaintiff seeks the following relief:

I.    Actual and compensatory damages equal to or greater than the statutory limit of $100,000 to make him whole for loss of liberty, humiliation, mental suffering, physical discomfort, injury to health, injury to reputation,

II.    Punitive damages against Defendants sufficient to punish them and to deter further wrongdoing;

III.    Treble damages;

IV.    Injunctive relief sufficient to protect Plaintiff and his family from harassment and intimidation of Defendants.

V.    Attorneys' fees, litigation expenses, costs, pre- and post-judgment interest as provided by

      law; and

VI.   Such other and further relief as the Court deems just and proper.




                               Respectfully submitted,


                               Brandon Kinard